The STATE of Ohio, Appellee,

v.

BAKER, Appellant.

[Cite as *State v. Baker* (1996), 111 Ohio App.3d 313.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 90APA09–1095.

Decided May 9, 1996.

*Michael Miller,* Franklin County Prosecuting Attorney, and *Steven Taylor,* Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker,* State Public Defender, and *David E. Klaus,* Assistant Public Defender, for appellant.

DESHLER, Judge.

This is an appeal by defendant, Thomas E. Baker, from a judgment of the Franklin County Court of Common Pleas following a jury verdict in which defendant was found guilty of felonious assault.

On January 18, 1989, defendant was indicted on one count of felonious assault, in violation of R.C. 2903.11. The indictment also included a firearm specification. The matter was tried before a jury beginning on August 21, 1990. The case is before us after granting defendant's request to file a delayed appeal.

The state's first witness at trial was Columbus Police Officer John Massie, who testified that on January 8, 1989, he was on a plainclothes assignment looking for stolen cars in the city's sixth precinct. At approximately 1:00 a.m., the officer was sitting in an unmarked blue AMC Concord, at the intersection of Atcheson and Graham, when he noticed two cars travelling eastbound on Atcheson at a high rate of speed. It appeared to the officer that the cars were either "chasing each other or following each other."

Officer Massie began following the vehicles. Eventually, one of the cars made a left turn onto Bassett Avenue while the other car continued eastbound. Officer Massie followed the vehicle which had turned onto Bassett Avenue. He followed the vehicle down an alley and the car eventually made a stop at Graham, just east of Maryland Park. As Officer Massie pulled up behind the car, the driver, identified at trial as the defendant, got out of the car armed with a gun. According to Massie, the defendant "jumped out, had a gun in his hand, went to a two-handed pistol grip and started firing shots at my car."

When the shots were fired, Officer Massie was still in his vehicle. The defendant fired several shots into Officer Massie's car and then started to approach the driver's side of the officer's vehicle. As the defendant continued to fire off shots, Officer Massie began to return fire from inside the vehicle. Officer Massie fired five shots through the window of his vehicle, breaking the glass. The defendant was about three feet from Massie's vehicle when the officer began returning fire.

Officer Massie attempted to fire a sixth shot but realized that he had already fired off all the rounds he had in the gun. Massie stated that the defendant then "extended his arms out and tried to pull the trigger and the weapon didn't go off. He looked at me and turned to his left and started running."

Officer Massie then radioed for assistance. He watched the defendant run back to the car and motion to a passenger in the car, later identified as the defendant's brother, Larry Baker, to follow him. The defendant's brother moved over to the driver's side, drove away and made a left turn onto Graham while the defendant tried to get inside the car. The defendant eventually motioned to his brother to drive on. Officer Massie followed the car while the defendant ran between houses along Atcheson. The car subsequently went off the left side of the road and struck some parked vehicles. The defendant's brother got out of the vehicle and started running. Officer Massie pursued him on foot and apprehended him at the intersection of Emerald and Taylor.

Columbus Police Officer Steve Rossiaky testified that he was dispatched to Atcheson Avenue in the early morning hours of January 8, 1989, where he observed Officer Massie signalling with a flashlight. Officer Rossiaky assisted

Massie in handcuffing the defendant's brother. Officer Massie indicated that the gunman was still at large.

Columbus Police Sergeant Gary Mathias was also dispatched to Atcheson Avenue on the night of the incident. As Officer Mathias was driving southbound on Taylor Avenue, he observed a man matching the description of the gunman. Officer Mathias noticed that the man was bleeding from a bullet wound in his arm. Officer Mathias and his partner placed the man under arrest.

Officer Rossiaky subsequently heard a radio dispatch indicating that a suspect had been stopped at Taylor Avenue. Officers Massie and Rossiaky drove to the area and Massie identified the defendant as his assailant.

The first witness testifying on behalf of the defendant was Willeanna Baker, the wife of Larry Baker. Baker testified that, on the evening of January 7, 1989, at approximately 9:00 p.m., an argument arose at her residence between Georgetta Wright and Robin Cason. Wright wanted Cason to come out of Baker's house. Baker went outside and told Wright to get away from the front of the house. Larry Baker then came outside and tried to calm down Wright. According to Baker, when her husband turned his back on Wright, she came up from behind "to try to cut him in the back, and I swung and moved her out of the way."

Baker testified that the defendant was visiting that night and had fallen asleep inside the house. Defendant was awakened by the noise and he came outside and yelled at Wright, causing Wright to run up the street. At about 10:30 p.m., Wright's brother, Richard Wright, who Baker referred to as "Minuteman," came to the Baker residence and knocked on the door. Minuteman was angry about the incident involving his sister, and he told Baker to "tell your husband for me that he doesn't be swinging at my sister because I take care of my family." Baker told Minuteman, "your sister was wrong, and she came at my husband with a knife and he threw her off the porch, and I swung back to get—to catch her from stabbing him in the back."

Baker testified that, while Minuteman was at the door, another man was standing by the side. Minuteman told Baker to "tell your husband that I have something for him." Baker responded, "no, you just going to have to take it up with me." Baker testified that Minuteman then told the man at the side of the house to "cap her." Baker testified that the defendant was in the house behind the door listening to the conversation. When Minuteman told the man to "cap her," Baker shut the door and she and the defendant heard the men running. Baker went to the back of the house and the defendant went out the front of the house. Baker saw the men jump into a blue car sitting in the alley.

Baker then called the police to inform them that two men were outside her residence "threatening to shoot me." Two police officers subsequently arrived at

the Baker residence. Baker testified that her husband and the defendant subsequently left the house that night in defendant's car with the defendant driving.

On cross-examination, Baker stated that neither of the two men standing outside her house knew that the defendant was behind the door. Baker stated that she was not aware that either her husband or the defendant had a gun.

The defendant testified on his own behalf. On January 7, 1989, the defendant visited the residence of his brother and sister-in-law to drink beer and socialize. While there, the defendant fell asleep and was awakened by the sound of his brother screaming that "no girl was going to stab him with a knife." The defendant went outside and observed a woman with a knife in her hand.

After the woman left the area, the defendant's brother drove into town to pick up his daughter, leaving Willeanna Baker and the defendant at the house. The defendant and Baker later heard a knock on the door. The defendant got behind the door while Baker went to answer the knock. The defendant heard Baker tell the man at the door that her husband was not home. The defendant testified that he heard a man standing off to the side ask the man at the door, "do you want me to cap her?"

Eventually, the men left and the defendant persuaded Baker to call the police and report the incident. The defendant's brother returned to the house after picking up his daughter. The defendant and his brother then left in defendant's car for defendant's residence. As the defendant drove to the intersection of 20th and Atcheson, a blue car pulled in front of him and did not move. The defendant then passed the car and when defendant later came to a stop sign, the blue car pulled up directly behind the back bumper of defendant's car. The defendant proceeded on Atcheson, past Maryland Park, at which time he determined that the car was following him. The defendant then attempted to elude the car, but the car continued to follow him.

The defendant eventually turned onto Graham Avenue and parked on the side of the street. The defendant then gave the following testimony:

"I got out of the car, walked up the middle of the street, and at the same time I got halfway back between Graham and the alleyway, this car come out of the alley and I asked the guy, I pointed my finger at him, asked him, why are you following me?

"And I knew then that he couldn't hear me because I could see the streetlamp reflecting off his passenger window—off his driver's window, excuse me. I walked over to his car and I yelled in the window, why are you following me?

"And the next thing I know, I counted four flashes. And I didn't know what was going on then 'cause it happened so quick. Only way that I knew I had been

actually shot was I felt something jerk my arm, that's the only way I knew I had been shot.

"I started to run, and I remembered I had a gun in my back pocket, I pulled my gun out and proceeded to keep my head down while I got away, 'cause I didn't know who he was. He did not identify himself one way or the other."

The defendant testified that he began running in the direction of a hospital, darting through several backyards until he got to Taylor. As he was walking down Taylor, he saw a police cruiser and yelled out but the cruiser did not stop. The defendant then walked out in the middle of the street and the cruiser stopped. The defendant was subsequently transported to the hospital where he was treated for gunshot wounds.

The state called Officer Massie as a rebuttal witness. Massie testified that, when the defendant got out of his vehicle and walked toward Massie's vehicle just prior to the shooting, the defendant was not pointing his finger nor did he make any statements. Massie denied that he fired four shots at the defendant prior to the time defendant shot at him; rather, Massie testified, the defendant fired approximately six rounds before he was able to reach for his weapon and return fire.

The jury returned a verdict finding defendant guilty of felonious assault and further finding that defendant had a firearm under his control during the commission of the offense. The trial court sentenced defendant by entry filed September 5, 1990.

Defendant's initial appeal from the judgment of the trial court was dismissed for want of prosecution. By entry filed August 15, 1995, this court granted defendant's motion to reopen his appeal.

On appeal, defendant asserts the following two assignments of error for review:

"First Assignment of Error

"Trial counsel's failure to request crucial jury instructions and failure to object to inadmissible hearsay resulted in appellant's conviction, and deprived appellant of his right to effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Section 10, Article I of the Ohio Constitution.

"Second Assignment of Error

"The trial court committed plain error by failing to exclude inadmissible hearsay, depriving appellant of his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution, and under Section 16, Article I, of the Ohio Constitution."

■ We will address defendant's assignments of error in inverse order. Under the second assignment of error, defendant contends that the prosecution introduced inadmissible hearsay statements during the testimony of Officer Massie. Specifically, defendant maintains that the prosecution, through the testimony of Massie, introduced findings of an investigation of the Internal Affairs Department regarding the shooting in order to show that the actions of the officer were justified. Defendant failed to object to this evidence at trial and now asks this court to find plain error pursuant to Crim.R. 52(B). "Plain error does not exist unless it can be said that but for the error, the outcome below would clearly have been otherwise." *State v. Jells* (1990), 53 Ohio St.3d 22, 24, 559 N.E.2d 464, 467.

Initially, we note that the issue of an internal affairs investigation was first raised during the cross-examination of Officer Massie by defense counsel. The record indicates the following exchange between defense counsel and Officer Massie during cross-examination:

"Q. [Defense Counsel]: Every time there's a police shooting, the Internal Affairs Department does an investigation of that shooting, don't they?

"A. [Officer Massie]: Yes, they do.

"Q. Okay. Now, as a practical matter, if Thomas had gotten out of that vehicle and you fired first, you might be in some big trouble with the Internal Affairs Department; isn't that true?

"A. No, that's not true.

"Q. Wouldn't make any difference?

"A. If someone comes at you with a firearm, no one on the police department tells you that you have to let them shoot at you first. That is totally incorrect.

"Q. So according to your own department regulations, if he got out of the car with a firearm, and if you were apprehensive about your own safety, you could fire then, you could use deadly force?

"A. Sure, your life would be in jeopardy if someone come at you with a firearm, sure."

Following this exchange, the prosecutor asked Officer Massie the following on redirect examination:

"Q. And since * * * [defense counsel] asked you about Internal Affairs investigations. Did you receive any type of reprimand or any type of disciplinary action for this shooting at all?

"A. No, I did not.

"Q. Was it considered a justified shooting?

"A. Yes, it was.

"Q. Whatever the correct term is, all right. You stated that if someone came at you with a firearm in his hand, you don't have to wait to be shot first?

"A. That's correct.

"Q. Okay. So, therefore, if you had shot first at the Defendant, would you have stated that on the stand?

"A. Sure.

"Q. Okay. And under those circumstances, you have no reason to lie and say that the Defendant shot first then, do you?

"A. It wouldn't make a difference whether he fired first or not, no.

"Q. Okay. So the facts that you gave here are the accurate ones?

"A. Yes."

During closing argument, defense counsel again raised the issue of a possible motive on the part of Officer Massie to testify falsely about who fired first, *i.e.*, the officer's possible concern about potential disciplinary action by the department. Defense counsel suggested that Officer Massie, when he saw the defendant get out of the vehicle and point at him, assumed that the defendant was armed and thus the officer fired first through the car window. Defense counsel stated the following during closing argument:

"If Officer Massie had admitted that that was the truth, don't you think he would have been in trouble with the police, with the Internal Affairs Department? Don't you think he would have been regarded something as trigger-happy, he would have had a lot more questions to answer if he admitted that that in fact had happened? So there was some motivation at least in Thomas telling the truth, there is some motivation on Officer Massie's part to falsify."

The state contends that, in the context of this defense theme, the nature of any discipline by the Internal Affairs Department was relevant to Officer Massie's motive, or lack of motive, to not tell the truth; thus, the state argues, evidence regarding the investigation was admissible, not for the truth of the matter asserted but, rather, for the nonhearsay purpose of explaining Officer Massie's state of mind.

Even assuming, without deciding, that such evidence was hearsay, defendant has failed to show plain error. The strategy of the defense was to show that Officer Massie had a motive to lie about who fired the first shots. As previously noted, the issue of an internal investigation into the shooting was initially raised by defense counsel, rather than the prosecution, in order to cast doubt on the officer's version of the shooting. As contended by the state, the finding of

justification tended to buttress the defense theory that the officer had such a reason to lie. Assuming, as argued by the defense, that the officer shot first without observing a weapon on the defendant, the investigatory finding highlighted the fact that the officer would have received an unfavorable result had he told the truth and, as suggested by the defense during closing argument, that there was "some motivation on Officer Massie's part to falsify." Thus, defense counsel had little reason to object to the finding of justification. Upon review, the record in this case does not show, beyond a reasonable doubt, that the result would have been different absent the admission of the evidence at issue.

Defendant's second assignment of error is overruled.

Under the first assignment of error, defendant contends that his counsel was ineffective in failing to request special jury instructions and in failing to object to inadmissible hearsay evidence.

In *State v. Seiber* (1990), 56 Ohio St.3d 4, 11, 564 N.E.2d 408, 417, the Ohio Supreme Court noted the appropriate standard for claims of ineffective assistance of counsel, holding that:

"Reversal of a conviction or sentence based on ineffective assistance requires appellant to meet the two-pronged standard of *Strickland v. Washington* (1984), 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674]. *Strickland* requires: (a) deficient performance, 'errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment'; and (b) prejudice, 'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' *Id.* at 687 [104 S.Ct. at 2064, 80 L.Ed.2d at 693]."

Defendant first contends that trial counsel was deficient in failing to request an instruction on "mistake of fact." Defendant argues that his self-defense theory at trial was grounded in his mistake of fact as to the identity of his pursuer and that a mistake-of-fact instruction would have allowed the jury to consider the actions of Wright and his accomplice and the effect of their actions on defendant's state of mind.

In *State v. Snowden* (1982), 7 Ohio App.3d 358, 363, 7 OBR 458, 462, 455 N.E.2d 1058, 1065, this court noted that:

"Mistake of fact is widely recognized as a defense to specific intent crimes such as theft since, when the defendant has an honest purpose, such a purpose provides an excuse for an act that would otherwise be deemed criminal. *Farrell v. State* (1877), 32 Ohio St. 456. When defendant, due to a mistake of fact, does not have the specific *mens rea* required by the statute, the maxim *ignorantia facti excusat* applies."

Defendant contends that the facts of this case indicate that the charges against him arose from a terrible mistake, *i.e.*, the defendant believed that the blue car

containing Officer Massie was actually the car occupied by the two men who came to the Baker residence earlier that evening. Further, defendant contends, the facts indicate that when the blue car followed defendant and his brother into the alley and stopped, defendant "thought he was trapped and leaped from the car with his gun."

The state contends that defendant's own testimony indicates that he was uncertain as to who occupied the blue car and that defendant did not claim that he acted under a mistaken belief. Thus, the state argues, defendant's claim of self-defense at trial was not dependent upon a theory that he mistook Officer Massie for either of the two men who were at the Baker residence earlier that evening; rather, it was based upon defendant's testimony that when he approached the driver's side of the blue car, four shots were fired at him, at which time the defendant drew his own gun and returned fire.

As to the issue of mistaken identity, defendant testified that, at the time the blue car was following him, "I didn't know if it was these guys or who it was." Further, while defendant acknowledged that the two men who appeared earlier in the evening at the Baker residence were both black males, the man defendant observed in the car "was a light-skinned man." The defendant stated, "I could see him, but I didn't know if he was white or black." Defendant further testified, "I didn't know who he was. He did not identify himself one way or the other." Thus, by his own testimony, defendant weakened a contention of mistaken identity; rather, as asserted by the state, the evidence indicated that defendant was uncertain at the time who occupied the car.

The evidence further undermines defendant's claim that he believed he was trapped at the time he got out of his vehicle. During cross-examination, the defendant was asked the following by the prosecutor:

"Q. The car that Officer Massie was driving that you state you knew was following you, had that car attempted to make you stop?

"A. No time whatsoever.

"Q. Had that car attempted to run you off the road?

"A. No.

"Q. Run you off the street, run you into the building, I suppose?

"A. No time whatsoever.

"Q. Had anyone fired at you from this car?

"A. At no time whatsoever.

"Q. Okay. So when you stopped your car and got out, you really didn't have to stop your car and get out, did you?

"A.   Yes, I did.

"Q.   Why?

"A.   If somebody is following you in that kind of a neighborhood, you don't let it go on and you don't let them run you into no dead-ends.

"Q.   You were the lead car?

"A.   That's true.

"Q.   I mean were you at a dead-end?

"A.   No, I wasn't.   I wasn't going to get to one neither.

"Q.   You could have gone out on another street and got off—

"A.   Right, if I knew where it was.

"Q.   I thought you knew the neighborhood?

"A.   I don't know the neighborhood.   I don't live there.

"Q.   Okay.

"A.   I went back and looked at the streets is how I know the streets today.

"Q.   Your brother was with you, he lives there, he knew the neighborhood?

"A.   He wasn't saying much.

"Q.   But you were on the street, you were in command of the situation really, you were leading so you didn't have to stop if you didn't want to, isn't that true, you stopped and got out because you wanted to?

"A.   No.   I stopped and got out because I thought that I was protecting my brother's life.   That's why I got out of the car.

"Q.   You thought you were protecting your brother?

"A.   Yes, ma'am.

"Q.   Why didn't you think your brother could protect himself?

"A.   That I don't know."

Based upon a review of the testimony presented at trial, we are unable to conclude that defendant's trial counsel was ineffective in failing to pursue a mistaken identity theory.   The fact that defense counsel may not have pursued every possible defense is not the test for a claim of ineffective assistance of counsel; rather, the issue is whether the defense chosen was objectively reasonable.   *Strickland, supra,* 466 U.S. at 688, 104 S.Ct. at 2064–2065, 80 L.Ed.2d at 693–694.   In light of the evidence presented, it was not unreasonable for defense counsel to focus upon a theory consistent with the testimony presented, *i.e.,* regardless of who occupied the blue car, defendant was justified in defending

himself after he was fired upon by the occupant of the car. Further, even assuming that counsel chose a questionable strategy, "the fact that there was another and better strategy available does not amount to a breach of an essential duty to his client." *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 37–38, 402 N.E.2d 1189, 1192.

■ Nor do we find merit with defendant's contention that his trial counsel was ineffective in failing to request an instruction on the "lesser included offense" of aggravated assault. Initially, we note that the proposed instruction set forth in defendant's brief, providing that "purpose and knowledge are not elements" of the offense of aggravated assault, is an incorrect statement of the law. The element of "knowingly" is a part of the offense of aggravated assault. R.C. 2903.12.[1] Further, aggravated assault is not a lesser included offense of felonious assault; rather, it is an inferior degree of felonious assault "since its elements are identical to those of felonious assault, except for the additional mitigating element of serious provocation." *State v. Deem* (1988), 40 Ohio St.3d 205, 210–211, 533 N.E.2d 294, 299.

■ The state contends that the defendant could not have obtained an instruction on aggravated assault because the evidence shows that Officer Massie did nothing that could have reasonably provoked the use of deadly force. Even assuming that defendant had presented sufficient evidence of serious provocation, we are unable to conclude that defendant has shown that counsel's performance was deficient. In *State v. McCullough* (Aug. 17, 1995), Cuyahoga App. No. 67786, unreported, 1995 WL 491124, the court noted that:

" * * * An appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. *State v. Brown* (1988), 38 Ohio St.3d 305, 319 [528 N.E.2d 523, 539–540]. It is a reasonable trial strategy to argue self-defense and not request an instruction on an inferior degree offense or lesser included offense. *State v. Moore* (1994), 97 Ohio App.3d 137, 149–150 [646 N.E.2d 470, 477–478]; *State v. Catlin* (1990), 56 Ohio App.3d 75, 78–79 [564 N.E.2d 750, 754–755]; *State v. Pryor* (June 8, 1989), Cuyahoga App. No. 55454, unreported [1989 WL 62214]. The inferior degree offense may conflict with the theory of self-defense or may confuse the jury. See *Catlin, supra.* In this case, it might be confusing or contradictory to argue that appellant acted in fear for his life, but also was provoked and acted in a fit of rage. * * * "

Similarly, in the instant case, defense counsel could have determined that an assertion that defendant was provoked and that he also acted in a fit of rage

---

1. We note that defendant has set forth a different proposed instruction in his reply brief.

would be inconsistent with defendant's trial testimony. Further, defense counsel could have reasonably decided not to seek an aggravated assault instruction under the evidence presented with the hope of attaining a complete acquittal. See *State v. Catlin, supra,* 56 Ohio App.3d at 79, 564 N.E.2d at 754–755. We are unable to conclude that defense counsel was ineffective under these circumstances.

■ Finally, defendant asserts that defense counsel was ineffective in failing to object to Officer Massie's testimony regarding an investigation by the Internal Affairs Department. We have previously addressed, under the second assignment of error, defendant's contention that the admission of this evidence rose to the level of plain error. Under a theory of either plain error or ineffective assistance of counsel, defendant "must establish not only that those actions were errors but absent those errors it is at least a reasonable probability that the outcome of trial would have been different." *State v. Turner* (July 19, 1995), Summit App. No. 17010, unreported, 1995 WL 434375. Similar to defendant's contention that admission of the evidence at issue constituted plain error, under a *Strickland* analysis, even assuming that defendant could demonstrate that counsel was deficient in failing to object to this evidence, defendant cannot show how a lack of objection undermined the fairness of the trial.

Defendant's first assignment of error is without merit and is overruled.

Based upon the foregoing, defendant's first and second assignments of error are overruled and the judgment of the trial court is hereby affirmed.

*Judgment affirmed.*

PETREE, P.J., and REILLY, J., concur.

ARCHER E. REILLY, J., retired, of the Tenth Appellate District, sitting by assignment.